## THE NORWAY PLAINS CO. *v.* BRADLEY.

The soil of the *alveus* of a river in which there is no tidal effect belongs to the adjacent riparian proprietors, the ownership of each extending *usque ad medium filum aquæ*, where the opposite banks belong to different persons.

An encroachment on the *alveus* of a running stream may not be complained of without the necessity of proving that essential damage has been sustained or is likely to be sustained therefrom.

No priority of occupation or use of water by a mill-owner upon a stream affects the right of a riparian proprietor above, to a reasonable use of the water flowing over his own land, by making improvements thereon, even to the extent of erecting a solid building upon the *alveus* of a stream, thereby diminishing the width of the current, unless such encroachment sensibly and injuriously affects the rights of such mill-owner.

IN EQUITY. The cause was referred to a master, to ascertain and state the facts, who, after hearing the evidence, reported as follows:

This bill was brought by the Norway Plains Company, a corporation duly established and existing under and by force of the laws of the State of New Hampshire, and located and doing business at Rochester, in said State, and owners in fee simple of a large tract of land situate in Norway Plains village, so called, in said Rochester, upon which they have erected, constructed, and for more than twenty years last past, before the filing of this bill, operated certain mills and machinery for the manufacture of wool and other materials into yarn, cloth, and other fabrics, and for other purposes connected with such manufactures, against Charles W. Bradley. Said mills and machinery are run and operated by the use of the water of the Cochecho river. For the purpose of providing a head and volume of water sufficient to run and operate said mills and machinery, said company have erected, constructed, and maintained, and still continue to maintain, two dams upon and across said Cochecho river, at said Norway Plains village, called the upper and lower dams, and a reservoir dam at Middleton, in said county, and expended large sums of money in so doing. Said upper dam is situate from fifteen to twenty rods below and southerly from the bridge over said Cochecho river, on the road leading from said Norway Plains village to Farmington, in said county. Said company are the owners in fee simple of the land upon which all of said dams stand, and have obtained, by purchase or otherwise, the right forever to maintain said lower dam, and to flow and cover with water any and all lands which may or can be flowed with water by means of

said lower dam at its present height. In 1843, and prior to that time, an old log dam was standing on the upper falls, the site of said upper dam. It has not been shown how long this log dam had been built, but it appears by the evidence that it was in 1843 an old structure, and considerably leaky and out of repair. The privilege had been owned and occupied successively by the Mechanics' Manufacturing Company, David S. Brown & Co., and the Gonic Manufacturing Company. It was at this time, viz., 1843, owned and occupied by the Gonic Manufacturing Company, from and under whom the plaintiffs claim and prove a good title. During the year 1843, a new frame dam was built by the said Gonic Manufacturing Company, to take the place of the old log dam, about sixteen feet below it on the stream; and, upon the completion of the new frame dam, the old log dam was taken away. The old log dam was straight, or very nearly so, across the river. The new dam was a frame dam covered with planking, like ordinary dams of that character, and had a wing at its eastern end, making an angle with the main dam, and extending up stream to a ledge on the shore, with which it connected, and to which it was fastened. Preparatory to the erection of this new frame dam, not before it was commenced, but before it was completed and before the old dam was removed, measures were taken to fix the height of the old dam, as a guide to the construction of the new one. To this end, George L. Whitehouse, of Farmington, an experienced and accomplished surveyor, made a survey and level, and, under his direction and in his presence, a drill hole was made in the ledge at or very near the easterly end of the wing of said new frame dam, and an iron bolt or pin, about one inch in diameter, was driven into this drill hole, the top of which bolt or pin, as left, was on a level with the top of the new dam built in 1843, and at about the average height of the old log dam. The old log dam had, by wear and tear, become somewhat dilapidated, and, being broken out on the top here and there, was not of uniform height through its entire extent. At one point it was ten inches higher, and at another point two inches lower than the top of the bolt, but its average elevation was a little higher than the top of the bolt. The iron pin or bolt now in the ledge near the eastern end of the wing of the present dam, situated about three inches easterly from said eastern terminus of the wing, and projecting on the north side one and three eighths inches, and on the south side two inches above the surface of the rock, is in the same place as the one put in as aforesaid under the direction of Judge Whitehouse in 1843, and the master finds, upon consideration of the whole evidence, that it is the same identical bolt. This bolt was set and left there as a monument to indicate and commemorate the height of the old log dam, and as a standard for the height of the new one then in process of erection, and the new frame dam was levelled by the top of this standard bolt, and built to that height precisely. This dam, built in 1843, was maintained and kept up to the height at which it was built, and on a level with the top of the bolt so long as it remained, which was from 1843 to 1862.

Occasionally during that time, by ice, and logs, and other things coming down over the dam, the cap-piece was broken out in places, but was immediately, or as soon as the state of the water would permit, repaired, and kept up to a level with the top of the bolt.

The master finds that the new frame dam built in 1843, as above described, actually held back more water, flowed the mill-pond of said upper dam to a greater depth, and consequently backed the water up higher upon the adjacent lands than the old log dam.

In 1862 a new stone dam was built on the site of the said dam of 1843 to supply its place. This stone dam was built at a distance of from seven and a half to eight feet below the dam of 1843, the main parts of the two dams across the stream being very nearly parallel. The dam of 1862 had a longer wing at its eastern end, the wing making a less obtuse angle with the main dam, and joining on to the ledge at its eastern extremity at very nearly the same point as the dam of 1843. This dam was intended and directed and contracted to be built to a level with the top of the bolt aforesaid, but by mistake of the contractors was not so made :—when completed it was found to be from one and two tenths inches to three and nine tenths inches lower than the dam of 1843 and the top of the bolt. This dam was completed in the fall of 1862, probably in the month of October, and the abundance of water in the dam rendered it unnecessary, difficult, and to some extent if not wholly impracticable at that time to make such an addition to the dam as would bring it up to the height of the top of the bolt. But when the dry season arrived in the following summer, on the fourth day of July, 1863, flashboards were nailed upon the dam to raise it to the height of the dam of 1843, and ever since that time, at all times when they could be, have been kept nailed to the front face of the cap of the dam and wing, to a level with the top of the bolt and no higher. They have been frequently broken and pushed off by the ice and by other means, but have always been replaced as soon as the condition of the water in the dam would permit it. The dam built in 1862 has been standing ever since and up to the date of filing this bill, and, by the aid of the flash-boards as aforesaid, has been kept and maintained as aforesaid, up to the height of the top of the bolt as aforesaid, and no higher.

In 1853 the plaintiffs purchased certain lands and the right to flow certain other lands in Middleton, in said county of Strafford, and built a reservoir dam near the outlet of the Great Heath (so called), situated about ten miles above said upper dam, on the Cochecho river. Said reservoir dam was built in the fall of 1853, was carried away in the spring of 1854, and rebuilt in the fall of 1854. The dam is about sixteen feet high, and the pond flowed by it, when full, contains about 272½ acres. The average depth of the water in this reservoir is about twelve feet. The dam has one gate, from two to two and a half feet wide. About the first of June, or between that date and the first of July, when the dry season of summer comes on, and the water commonly flowing in the river is insufficient for the use of the plaintiffs'

mills, they begin to let out the water from this reservoir,—at first, when the pond is full, hoisting the gate about one and a half inches, and gradually more, as the pond falls, up to ordinarily about four inches. Sometimes, however, in exceptionally dry seasons, the gate is raised higher, but has never, in any season, been raised above nine inches. So long as the drouth continues the gate is kept up, and whenever rain falls it is shut down, so as to graduate the supply to the requirements of the plaintiffs' said mills. The water is drawn from this reservoir uniformly during the summer months, that is, usually from June to October, and in reasonable quantities,—such quantities only as experience has shown to be reasonably necessary and requisite for the beneficial operation of the plaintiffs' said mills. The quantity of water so let down from said reservoir is not larger than is accustomed to flow in some seasons of the year, but is considerably larger than the accustomed flow of the stream in such dry season; and the result is, that the channel is more uniformly full of water through the year. The natural channel of the river between said reservoir and said upper dam at Rochester is sufficient to carry all the water which the plaintiffs send down from their reservoir, and the water so sent down has run within the natural banks of the stream until it reached said upper dam mill-pond, and has never, unless a heavy rain fell while the gate was open, overflowed the natural banks. But in consequence of this detention of the water in the reservoir and sending it down in a mode different from its natural flow, the channel is kept more uniformly filled with water through the year, so that in the summer months the adjacent meadows of riparian owners are not so thoroughly drained, and the water percolates them during the summer from the stream under the earth; and thereby, in process of time, the grass is rendered of inferior quality and less in quantity. Another consequence of, and the one especially sought by, the above described detention and letting out of the water by means of the reservoir is, that the plaintiffs' said upper dam is kept more uniformly full during the summer months; and they are thus enabled, in times of naturally low water, to secure more power and head for driving their machinery. By the same means the tract of land to be hereafter described, belonging to the defendant, is covered and flowed with water more uniformly and to a greater depth than it otherwise would be during the summer months since the building of said Middleton reservoir.

In September, 1864, Mr. Jeremiah Waldron owned the outlet of a pond called March's pond, in New Durham, in said county, about fifteen miles above said upper dam in Rochester, and maintained a dam there. Two ponds flowed by this dam were connected by a culvert, and covered about 160 acres. The stream from this March's pond is called the Ela river, and is an affluent of the Cochecho, making a junction with that river about ten miles above said upper dam. Mr. Waldron owned and operated a mill on this stream about two miles below his said dam, and drew the water from the ponds, hoisting his gate there for the purpose whenever he wanted it for the use of his said mill.

He drew it in large quantities, and somewhat irregularly. In the fall of 1864, the plaintiffs purchased this outlet dam, and the right to flow certain lands adjacent to said ponds, and raised the dam some three or four feet higher than before, increasing the area flowed by said dam to about 200 acres, and creating a reservoir for the use of their said mills at Rochester.

Mr. Tristram H. Fletcher and Mr. Coburn, who owned a mill about a mile below said reservoir dam, on said Ela river, acquired at the same time, viz., in the fall of 1864, from said Norway Plains Company, the right to raise the gate—a two-foot gate—at the reservoir one and a half inches, until the water should be drawn down to the height of the old dam. When below that height they have the right to raise the dam two inches—a right they had purchased of said Waldron, the former owner of said outlet dam. These rights said Fletcher and Coburn avail themselves of, and the plaintiffs also draw water for the supply of their said mills in Rochester during the dry season, extending generally from June 15 to September 15, and usually nearly exhaust the reservoir. They draw the water uniformly during the dry season, which has been kept back and reserved during the winter and spring months. The plaintiffs let down the water in the New Durham reservoir in reasonable quantities for the supply of their said mills, and in all respects as they do the water of the Middleton reservoir. The water thus used increases the volume of water flowing naturally in the stream during the summer months, and contributes in its proportion to the production of those effects upon the height of the stream, upon the land of riparian proprietors, upon the plaintiffs' said upper dam mill-pond, and upon the defendant's said land, which have been described as resulting from the larger Middleton reservoir. No mention is made of said New Durham reservoir or dam in the bill or answer,—but it was agreed by the parties in taking the testimony, and upon the hearing before the master, that the facts in regard, to them should be stated, and constitute a part of this case.

Parker W. Horne, Jeremiah Roberts, and others are owners of the mill privilege and a saw-mill thereon, situate on said Cochecho river, next and from four to five miles above the plaintiffs' said upper dam ; and from June 15 to September 15 they are by law bound to, and do, keep the gates of their said saw-mill dam up, and permit the unobstructed passage and flow of the water in the stream. During the remainder of the year,—from September 15 to June 15,—they keep their gates shut down, and have the entire control of the water in the stream, holding it back and letting it out at their free will and pleasure ; and the plaintiffs have at various times purchased water of them in order to keep their mills running.

In July, 1868, the defendant caused several loads of stones to be deposited near said bridge in Rochester, upon land covered and flowed with water by means of said upper dam. He had previously staked out this parcel of land, situate on the easterly side of Cochecho river, immediately above and northerly from said bridge, from twenty to

twenty-five rods above said upper dam, and extending about fifty feet on the eastern margin or shore of said river and the pond of water raised and held back by said upper dam, and about thirty feet into said river or pond, embracing an area of about fifteen hundred square feet, about one thousand square feet of which is covered by water when the water in said upper dam is at the level of the top of said iron bolt or pin. Said tract of land, so staked out, slopes gradually down towards the river bed on the westerly side, at which point it is flowed and covered with water to the depth of three or four feet when said upper dam is full to the top of said bolt. The defendant, in 1868, previous to the filing of this bill, drew, conveyed, and deposited, and caused to be drawn, conveyed, thrown, and deposited into said pond and river, and upon said parcel of land so staked and set out as aforesaid, a considerable quantity, to wit, thirty-one one-horse loads of split granite blocks, unhammered, and suitable for the foundation of buildings, with the design of laying a stone foundation for a building forty feet in length by twenty-four feet in width. It was his purpose to build a foundation on the river bottom, which, on the westerly side, and parallel to the thread of the stream, should be two feet thick and about five feet high ; and on the sides parallel to the bridge, about one and one half feet thick, and of corresponding height. He was intending to lay the outer wall parallel to and farthest in stream upon a line of stones that had been laid in the stream previous to his ownership of the land, and which extended some fifty or sixty feet from the abutment of the bridge up the stream. This line of stones was laid about July 4, 1863, as a foundation for a building, by the agents and servants of Mr. Benjamin Barker. At the time they were laid there was no water there ; and Mr. Sharp, the superintendent of the plaintiff company, was present, and saw the transaction, and made no objection to it. When said upper dam was full to the height of the top of the bolt, the water along beside this line of stones was of the average depth of three feet four inches, and on the line of stones was of the average depth of about two feet. At the distance from said line of stones of about twenty feet shoreward was the shore line when said upper dam was full to the top of said bolt. Mr. Sturtevant, the agent of said Norway Plains Company, upon being consulted on the subject by the defendant previous to this action, had prohibited him from so doing ; and as soon as the plaintiffs learned of the defendant's proceedings in carrying out this purpose, they caused a written notice to be served on him, formally forbidding his so doing.

The plaintiffs soon after obtained an injunction from the supreme judicial court, which prevented the defendant from depositing any more stones upon said tract of land, and from laying those already there into a foundation. The execution of the defendant's purpose, by building the foundation of a building forty feet by twenty-four, would have caused the displacement of about two hundred cubic feet of water when the dam was full to the top of the bolt as aforesaid. The defendant, previous to the acts complained of in this bill, acquired,

and has ever since held, the ownership in fee simple of the land on which these stones were laid and proposed to be laid, subject to the rights of the plaintiffs, whatever they may be, deriving his title under a warranty deed of Benjamin Barker, bearing date June 15, 1868, and by its terms conveying to the defendant the said premises in fee simple, " subject to flowage by Norway Plains Company's dam at its present height,—said Bradley to have the right to lay a wall for the foundation of any building he may erect on said land."

There was no evidence before the master that the plaintiffs' right to flow the premises in question had been settled at law, or that there had ever been any controversy at law upon that question.

The complainants prayed for an injunction restraining the defendant " from filling up with stone or any other material the tract of land so staked out by him, or any other tract or parcel of land flowed or covered with water by means of the plaintiffs' said upper dam at its present height," and for a decree ordering him to remove the stone and other material deposited upon the tract of land within the margin of the stream.

*Wells & Eastman,* for the plaintiffs.

All the material allegations in the plaintiffs' bill, those denied as well as those not denied, are, we submit, substantiated and proved by the master's report.

I. The defendant in his answer alleges that the plaintiffs maintain their upper dam at Rochester higher than they have a right to. The master finds that in 1843, and prior to that time, there was an old log dam on this mill site ; that during that year this old log dam was removed, and a new frame dam built in its place ; that before the removal of the old log dam, its average height was ascertained by a competent engineer, and an iron pin set in the ledge on the eastern end of the dam to indicate that height, the top of which pin was on a level with the average height of the old log dam ; that the new frame dam was built to a level with the top of that iron pin, and no higher, and was maintained at that height so long as said dam remained ; that in 1862 a new stone dam was built below the frame dam on the same mill site, and when completed was found not to have been built to a level with the top of the iron pin, and flash-boards were then put on to raise the dam to a level with the top of that iron pin, and no higher, and have ever since been maintained at that height, so far as they could be. Thus, in addition to finding the plaintiffs own the lands, mills, dams, and water rights, as alleged in their bill, he finds that the plaintiffs have maintained their upper dam at Rochester at its present height for twenty-five years before the filing of their bill. How long the old log dam had been maintained prior to 1843 does not appear. This finding would give the plaintiffs a right by prescription to maintain their dam at its present height, had they no other right, and had

there been no dam there prior to 1843.   *The Winnipiseogee Lake Co.* v. *Young,* 40 N. H. 420.   But the plaintiffs' paper title is sufficient without resorting to prescription.

II.  The plaintiffs, having thus shown their right to maintain their upper dam at its present height, how stands the matter as to their reservoirs ?

The master finds that the plaintiffs own these dams and the land on which they stand, and also all the lands flowed by them.   There can be no question of the plaintiffs' right to hold back and retain in their reservoirs so much of the surplus or waste water as they can.   The only question that can arise is as to the manner in which they may let down and use this surplus or waste water.   We submit that the plaintiffs have a right to make a "reasonable use" of this reserved water for the purpose of operating their mills at Rochester—a right to let it down in reasonable quantities in the drier season of the year, and so distribute and use it as to equalize, as nearly as may be, the quantity running to their mills throughout the whole year.   The water thus used must be so let down that it shall all ordinarily run and keep within the natural banks of the stream.   If, while this surplus water is being thus let down, a heavy rain should fall whereby the stream should overflow its natural banks, or if, in thus equalizing the flow of the stream, the lands of riparian owners are not so thoroughly drained or kept so free from water as they otherwise would have been, the plaintiffs are not in fault : they have merely exercised their right to make a reasonable use of this water.   Unless surplus or waste water can be thus reserved, let down, and used to operate mills and machinery, mill privileges and water-powers are of little value for continued manufacturing or mechanical purposes.   There are very few streams of sufficient capacity to operate mills and machinery all the year round, without reservoirs to supply the lack of water in the summer and fall months, as well as in the colder winter months.   Indeed, it is upon this principle and this alone—a reasonable use of the water—that mill-ponds have been created and used, from time immemorial, for the operation of saw-mills and grist-mills.   By means of dams the water is kept back, a head raised, and the water is let out and used to propel these mills, not regularly, but as occasion may require.   The master finds that the plaintiffs let down the water from these reservoirs *uniformly during the summer months, and in reasonable quantities—such quantities only as experience has shown to be reasonably necessary for the beneficial operation of their mills ;* that the quantity of water so let down is not larger than is accustomed to flow in some seasons of the year, but is considerably larger than the accustomed flow of the same in the dry season, and thus the channel is more uniformly full of water through the year ; that the channel between the reservoirs and upper dam is of sufficient capacity to carry off all the water sent down, *and the water so sent down runs within the natural banks of the river, unless in case of a heavy rain, while the reservoir gates are open :* thus the channel is kept more uniformly full, and the meadows on the banks are not so thor-

oughly .drained as they might be but for this, and thus the adjoining land may be damaged to some extent ; and that the plaintiffs have the right thus to let out and use their reserved water. *Hayes* v. *Waldron*, 44 N. H. 580 ; *Gould* v. *Boston Duck Co.*, 13 Gray 442 ; *Springfield* v. *Harris*, 4 Allen 494; *Drake* v. *Hamilton Woolen Co.*, 99 Mass. 574. The last named case runs on all fours with this. See, also, *Rogers* v. *Kennebec & Portland Railroad Co.*, 35 Me. 319 ; *Whittieer* v. *Same*, 38 Me. 26 ; Redfield on Railways, ed. 1858, sec. 75, p. 156, and notes.

The plaintiffs may thus let out and use the water in their reservoirs, notwithstanding the fall of heavy rains while they are thus drawing may cause the water of the river to overflow its natural banks, and thus injure the riparian owners above or below. *China* v. *Southwick*, 12 Me. 238; *Smith* v. *Agawam Canal Co.*, 2 Allen 355 ; *Davis* v. *Getchell*, 50 Me. 602 ; *Drake* v. *Hamilton Woolen Co.*, above cited.

III. The plaintiffs being thus the undisputed owners of the land, mills, machinery, and dams, and having the right to maintain their upper dam at its present height and keep up the water to that height, and having the right to let down the water from their reservoirs, as reasonably required, for the operation of their mills and machinery at Rochester, the defendant had and has no right to obstruct or impede the flow of the water in the stream or pond, or to fill up any part of the area flowed by the dam. The master finds that the defendant put thirty-one horse cart-loads of stone into the plaintiffs' pond before he was enjoined. How many more loads, or how large a quantity he would have put in had he not been enjoined, does not appear. He further finds that the defendant intended to put in as many stones as might be necessary for the foundation of the building he proposed to erect—such a building as is described in the master's report ; and the defendant says that, as a riparian owner, he had a legal right thus to fill up the pond. We submit that the law gives him no such right. He, and those under whom he claims title, may have the right to make a reasonable use of the water of the stream and pond while it remains on his or their land, but neither he nor they have a right to obstruct or impede the water in its passage down stream, or to diminish the area flowed by the plaintiffs' upper dam. To hold otherwise will be to hold that the defendant and other riparian owners have the right to wholly destroy the plaintiffs' water-power. If part of the plaintiffs' pond may be filled up or obstructed, how great a part of it ? How far may obstructions extend into the stream or pond? If they may be extended twenty feet, why not fifty feet ? why not to within a few feet of the thread of the stream, leaving barely a narrow canal or sluice-way for the water to rush through ? and if one riparian owner may .do this, why not all similarly situated ? The other riparian owners have the same rights as the defendant and those under whom he claims title ; and having such rights, will they not assert them, especially in such a place as Rochester village,—a place rapidly increasing in population, buildings, and business,—where land is in active demand at high prices, and where the land flowed, as in this

case, is situate in the centre of the village ? The exercise of such a pretended right by one riparian owner, and legally protecting him in such exercise, is but the entering wedge for further encroachments by him, and an invitation to all other riparian owners to do likewise, giving him and them a judicial guaranty that they shall be protected in so doing. Suppose a large number, say thirty or more, riparian owners on this pond are awaiting the result of this suit, and, if determined in favor of the defendant, are ready to proceed and fill up and build upon a large part of the plaintiffs' pond, or compel the plaintiffs to pay them large and extortionate prices for the relinquishment of their supposed rights to obstruct and fill up the plaintiffs' pond and stream : is this a matter of small importance to the plaintiffs ? If the defendant and other owners have the legal right to do thus, of course the plaintiffs must submit, and the cause of justice have its way ; but to hold that they can thus do, seems to us a position wholly untenable.

That the plaintiffs are entitled to maintain their dam at its present height, and hold the area flowed by it without diminution or obstruction, as they have a right to by deed and by twenty-five years' occupation before the filing of their bill, seems to us too plain to require further argument. That the defendant has no legal right to fill up or obstruct the plaintiffs' pond or stream, we refer to *Blood* v. *Lowell & Nashua Railroad*, 2 Gray 137 ; *White* v. *South Shore Railroad*, 6 Cush. 412 ; *Boston & Roxbury Mill-dam Corporation* v. *Newman*, 12 Pick. 467.

IV. The defendant claims that an injunction shall not be granted.

1. Because the immediate damages are small, and the plaintiffs, as he says, can recover full indemnity for them in a suit at law.

2. Because the plaintiffs' rights had not been settled at law when their bill was filed.

(1.) As to the first point, we admit, in this particular case, that the damages are small ; but the principle involved is a most important one —a principle which lies at the foundation of all the plaintiffs' water rights—and a refusal to grant the injunction as prayed for may, and in all human probability will, prove most disastrous to them. This is not the case of one riparian land-owner on the plaintiffs' pond and stream only, but the case of all. What one may do, all may do ; and if one riparian owner can legally encroach on and impair the plaintiffs' water rights, all may and probably will do the same. A compensation in damages recovered in a suit at law will be no compensation. Ordinarily, the damages recovered by a party in a suit at law in cases of this kind are trifling, and pay but a small part of the plaintiff's expense of vindicating his rights. If he comes off victorious, a few such victories will ordinarily inflict financial ruin upon him, when he must bring many such suits,—suits against each person encroaching on his rights, which might be prevented by injunction ; and to refuse injunction is substantially a denial of justice. Certainly the law is more wisely administered, when it is so administered as to prevent injury, than when it suffers or permits injury to be done, and afterwards punishes or

amerces in damages. Proceedings at law, in some cases, fail to afford adequate redress for injuries already perpetrated, and wholly fail to prevent injuries threatened to be perpetrated. Here the equitable powers of the court come to the rescue. The General Statutes, ch. 190, sec. 1, which is substantially a reënactment of the Revised Statutes, ch. 171, sec. 6, gives this court the power of a court in equity in all cases " where there is not a plain, adequate, and complete remedy at law." This gives the court full equity powers. Cooper's Eq. Pleading 128, 129 ; Mitford's Eq. Pleading 112, 113.

The remedy must be plain, for if it be doubtful or obscure at law, equity will assert jurisdiction. *Rathbone* v. *Warren*, 10 Johns. 587 ; *King* v. *Baldwin*, 17 John. 384.

It must be adequate ; for if at law it falls short of what a party is entitled to, that founds a jurisdiction in equity, and it must be complete,—that is, it must attain the full end and justice of the case. It must reach the whole mischief, and secure the whole right of the party in a perfect manner at the present time, and in future ; otherwise equity will interfere and give such relief and aid as the exigency of the particular case may require. Story's Com. on Equity, sec. 33 ; *Winnipiseogee Lake Co.* v. *Worster*, 29 N. H. 445 ; *Walker* v. *Cheever*, 35 N. H. 339 ; *Wells* v. *Pierce*, 27 N. H. 512 ; *Webber* v. *Gage*, 39 N. H. 182 ; *Knapp* v. *Douglas Axe Co.*, 13 Allen 1 ; *Porter* v. *Witham*, 17 Maine 292.

(2.) As to the second objection, that the plaintiffs' rights had not been settled at law when this bill was filed,—it is too late, we submit, to make it. The defendant answered the plaintiffs' bill without objection on this point, and both parties proceeded to take very voluminous testimony. This testimony has been submitted to a master, who has reported the facts to the court for their decision. The master has done all that a jury could have done,—found the facts ; and the court must pronounce upon the facts thus found. It is not always necessary that the questions shall be settled at law before a bill in equity can be maintained. A complainant, who has established his right at law, stands in no better position in respect to obtaining an injunction, than one whose right is not disputed. *Quackenbush* v. *Van Riper*, 2 Green Ch. 350.

Chancery has concurrent jurisdiction with courts of law in cases of diversion of streams, and a court of equity may issue an injunction to prevent destruction of an ancient watercourse, though the plaintiff has not established his title at law. *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162 ; *Winnipiseogee Lake Co.* v. *Worster*, 29 N. H. 448, and cases there cited.

In *Porter* v. *Witham*, 17 Maine 292, above cited, the court say there
can be no doubt it would be unjust to destroy property, or the use of it, before it has been determined, by a judicial decision or by lapse of time, that the owner can have such a right as he claims and enjoys. If lapse of time is sufficient to give a right, the plaintiffs have established that. But how shall this court know that lapse of time has given a right, unless this fact is proved to them ? and if this fact may

be proved, why not other facts be proved and reported to them by their officer, the master, whom they have appointed for this purpose ? It seems to us unnecessary to pursue this course of reasoning further. As to the exercise of equity jurisdiction by the court, we refer also to *Bean* v. *Coleman*, 44 N. H. 539; *Burnham* v. *Kempton*, 44 N. H. 78 ; *Ranlet* v. *Cook*, 44 N. H. 512.

The defendant has not filed the amendments he was authorized to, so that, if there is anything in them, we are not prepared at this time to answer them.

*Worcester & Gafney*, for the defendant.

The plaintiffs fail to show that they have any right to relief by injunction;—more than that: they fail to show that they have any rights, legal or equitable, that have been infringed by the defendant. In regard to the obstruction of the flow of water in the stream, which the plaintiffs in their bill claimed to be caused by the operations of the defendant, there was no evidence offered of that fact by the plaintiffs. This was too preposterous a claim for them to seriously attempt to maintain. Mere inspection of the premises or of the plans submitted by both parties demonstrates the absurdity of this pretence. The master's report does not find, as a fact, that there was any obstruction. The plaintiffs do not claim it in their brief. The master's report fully establishes the fact that the plaintiffs wrongfully caused the water to flow back on the defendant's land in question. He finds "that the new frame dam, built in 1843 as above described, actually held back more water, flowed the mill-pond to a greater depth, and consequently backed the water up higher on the adjacent lands, than the old log dam." Therefore the plaintiffs' prescription to cover and occupy with the water flowed by their upper dam (if such a right can be obtained by prescription as against the right of a riparian owner to occupy his land for the purpose of putting in a foundation of a building) commenced in the fall of 1843, the time when the frame dam was completed as to this excess of height. *Curtice* v. *Thompson*, 19 N. H. 471.

The report finds that this frame dam, built in the fall of 1843, and which flowed back the water deeper on the defendant's land than the former old log dam, was kept up to the height at which it was built, with occasional interruptions, till 1862, a period of but nineteen years, when a new stone dam was built, and completed in October of that year. This dam, the master reports, was found to be lower by two or three inches than the top of the pin, the pin being, as the plaintiffs claim, of the same height as the top of the frame dam. The plaintiffs say, in their brief, that when the dam was completed and found not to be as high as the top of the pin, " flash-boards were then put on to raise the dam to a level with the top of that iron pin." The master does not find any such thing. He says in his report,—" This dam was completed in the fall of 1862, probably in the month of October. When

the dry season arrived in the following summer, on July 4, 1863, flash-boards were nailed upon the dam to raise it to the height of the dam of 1843." So this stone dam of 1862 remained two or three inches lower than the frame dam which preceded it, from October, 1862, till July, 1863—a period of nine months. This was an entire cesser of the use. Even then, in July, 1863, the dam was not raised to what they claim was the height of the preceding frame dam, but instead of that only flash-boards were put on. This fatal gap in the plaintiffs' prescription cannot be bridged by any mere intentions, directions, or contracts to build the dam to the top of the pin. If intentions would close up a chasm of nine months, why not of nine years, or of nineteen years? *Winnipiseogee Lake Co.* v. *Young*, 40 N. H. 420, does not sustain the plaintiffs' views. In that case, the plaintiffs claimed, and did exercise for twenty years, the right to raise the water as high as their dam would raise it when there was sufficient water to fill it. In the case at bar, the plaintiffs, according to their own showing, only claim, but did not exercise for twenty years, the right to raise the water higher than their dam would when there was sufficient water to fill it. The master's report shows that there was so much water running over the dam during this interval of nine months that it was difficult to put on such additions as would bring it to the top of the bolt.

There must be an adverse, exclusive, open, and uninterrupted enjoyment for twenty years of an incorporeal hereditament, to create a presumptive right to an easement. Angell on Watercourses, 6th ed., sec. 375 ; *Watkins* v. *Peck*, 13 N. H. 360, 370 ; *Bullen* v. *Runnels*, 2 N. H. 255. This was not an enjoyment of the easement; on the contrary, the act of building the dam to a height of three inches less than the former one, and leaving it " completed," as the master reports, for nine months, was an open abandonment of their claim. The reason why the enjoyment of an easement should be adverse, open, and uninterrupted for twenty years is, that the owner of the servient tenement may have information during that time of the claim of the owner of the dominant tenement. This he does not have in the case at bar ; on the contrary, he has information of the most positive kind that the plaintiffs had abandoned this claim. The report does not find that the defendant, or any owners of adjacent lands flowed by this dam, had any notice or knowledge whatever of the intentions or contracts of the plaintiffs to raise the height of their stone dam the three inches which it was lower than the frame dam that preceded it : so there can be no pretence of an adverse occupation during these nine months. It is only when a prescriptive right has been once established, that it should be construed favorably to the party who has acquired it. See Angell on Watercourses, sec. 383.

It would seem that the plaintiffs fail as signally in their paper title as in their claim to title by prescription, since the master does not find that they had any title by grant to the easement claimed, and does find

that the defendant had acquired, previous to the act complained of, the ownership in fee simple of the land on which the stones were laid, and had ever since held it.

But such an easement as the plaintiffs claim in the land of the defendant cannot be obtained by prescription. No one, by flowing the land of another for twenty years, even though the enjoyment of the right of raising a head and flowing back the water be, during that period, open, adverse, exclusive, and uninterrupted, can obtain the right to occupy the land with water so that the owner of the servient tenement will have no right to occupy his land by laying the foundation of a building. In examining this question, it is worthy of remark that the plaintiffs' counsel, with all their well known learning and industry, have failed to find any instance where such a right has been claimed as is set up by the plaintiffs in the case at bar. Of the three cases cited by the plaintiffs in support of their views, only one has any bearing upon the subject. This is *Boston Corporation* v. *Newman*, 12 Pick. 467. The decision in this case is founded upon a statute creating the corporation, and granting certain powers for creating water-power by means of tide-water; and to give any effect to the grant, it was necessary to construe it as giving the right to occupy the land with water to the exclusion of the owner of the servient tenement. This was to all intents and purposes a specific grant of the right to occupy the land with water to the exclusion of the land-owner's right to fill up the area covered therewith. In Massachusetts, under the mill acts, a man is not obliged to make a complaint for damages. He has a right to make a dike to secure his land from the water. In *Jordan* v. *Woodward*, 40 Me. 317, it was held that the riparian proprietor of land, overflowed by means of a dam for the working of a water-mill, may occupy the land overflowed by erecting piers thereon, and constructing booms. In this case the defendant had been paid his damage under the statute. But the court held that those damages were only for flowing.

" A prescription, to be good, must be a reasonable one." Washburn on Easements, p. 280, sec. 39. Would it be giving a reasonable operation to a prescription to hold that by the flowing of a land-owner's land for twenty years he loses his right to build a wharf or pier on his own land? If he should be the owner of the land on both sides of the stream, he could not put in a pier for a bridge, according to the plaintiffs' principles. *Bean* v. *Coleman*, 44 N. H. 539.

The riparian owner has the right to use the water of a stream for the purpose of watering his cattle and to irrigate his land. But would any one pretend that if the riparian owner should fail to avail himself of these rights for a period of twenty years, the mill-owner lower down the stream would have such an easement, in the use of all the water in the stream, that the land-owner would lose his right to the water for the purpose of irrigation? And if he should use it for this purpose, could the mill-owner obtain an injunction to prevent his so doing? If the views of the plaintiffs are sound, the land-owner would not have this right. Neither the land-owner nor any one else would have the

right to raft logs in the stream, or use a boat, or bathe therein, since all these would infinitesimally diminish the volume of the water ponded back.

Again: it would be unreasonable to permit such an easement to be acquired by prescription, because the benefit to the owner of the dominant tenement is so infinitesimally small, when compared with the great injury, or rather entire destruction, of the property of the owner of the servient tenement. All the substantial and necessary benefits of raising his dam, such as increasing the head of water, and being shielded from the liability to damages for flowing the land, are enjoyed by the mill-owner. What reason or justice is there in joining, as a necessary incident to those rights, the oppressive and unjust power of excluding the land-owner from all control or power over his land, leaving his property in it a mere barren name?—and all this to place in the hands of the mill-owner not a substantial, appreciable benefit, but rather a right and power to oppress and annoy his neighbors. In this very case the plaintiffs do not pretend that they have or would suffer any appreciable damage, or that they derive any material advantage from occupying this space with water. But if the plaintiffs' doctrines are sustained, the entire property of the defendant in this land is destroyed.

The right to occupy the land with water to the exclusion of the owner, so as to prevent him from building any structure upon it, is a right separate and distinct from the right to raise a head of water, and to cause it to flow back upon the land of the adjacent proprietors. If such a right could be gained by prescription, there ought to be some way in which the land-owner could prevent this claim of easement from ripening into a right: for this right by prescription commences in a wrong. Now there should be some remedy for this in the power of the land-owner: for it is the theory and boast of the law, that every wrong has its remedy. It would be necessary for the owner of the servient tenement to fill up his land with earth, or to build a dike around it, in order to preserve his right to build a building upon it, against the prescription of the mill-owner, who may in any way have obtained the right to raise his dam. The unreasonableness of imposing upon the land-owner the necessity of taking this precaution affords the strongest argument why it should be held that the plaintiff has not the right claimed by him.

In short, this use of the land by the dominant owner is not an adverse enjoyment. As to all the substantial, appreciable benefits derived from it,—that is, the raising of a head and fall,—it was a use consistent with, and therefore not adverse to, the rights of the defendant. Until the acts complained of, the defendant had no occasion to build a building upon the land. The very ground of title by adverse enjoyment is, that the party against whom it is set up has so long permitted the adverse enjoyment, and failed to vindicate his rights, that the presumption of a grant is raised. But there can be no such presumption, and consequently no title by adverse enjoyment, where no violation of

a right is shown to exist. Angell on Watercourses, 6th ed., p. 387 ; *Holsman* v. *The Boiling Spring Bleaching Co.*, 1 McCarter (N. J.) 335 ; *Crosby* v. *Bessey*, 49 Me. 539 ; *Cooper* v. *Barber*, 3 Taunt. 99 ; *Donnell* v. *Clark*, 19 Me. 174. The defendant had had no occasion to fill up the area of land, or to build a building upon it, till the acts complained of ; and until such occasion arose the plaintiffs had no adverse enjoyment of the right claimed. The plaintiffs, in their brief, say that the defendant has a right to the reasonable use of the stream and pond while it remains upon his land. Very true : but has not the defendant a right to the reasonable use of his land also? The plaintiffs draw a highly colored picture of the evil consequences to mill-owners if the law should allow riparian proprietors to obstruct the stream ; but since the report does not find that there are any obstructions, the pertinence of these objections is not apparent. But where land is in active demand at high prices, and " where the land flowed, as in this case, is situate in the centre of the village," would it be sound legal policy to call forth the most formidable engine known to the law to enforce the plaintiffs' right to what, according to their own showing, is but a mere legal figment, against the substantial and valuable rights of the defendant ?

The defendant's land also receives damage wrongfully by the manner the water is let down from the Middleton and New Durham reservoirs. The report finds that the defendant's land is covered and flowed with water more uniformly and to greater depth than it would be during the summer months, since the building of said reservoirs. To these effects the New Durham reservoir contributes its proportionate share. This New Durham reservoir was built in the fall of 1864, long after the date of any deed to the plaintiffs of any water rights.

It is nothing to the purpose that the water, in its passage from the reservoirs to the plaintiffs' upper mill-pond, does not overflow the natural banks of the stream. The report finds that it exceeds the natural banks of the mill-pond, and thereby does damage to the defendant's land, so that the authority—*Drake* v. *Hamilton Woolen Co.*, 99 Mass. 574—does not apply.

The plaintiffs have no right to relief by injunction, because the damage is so small as to be inappreciable ; and while the granting of an injunction would be very annoying and oppressive to the defendant, the plaintiffs would derive very small benefit. The plaintiffs' claim to relief by injunction is on the ground that the damage is irreparable. But it is a contradiction in terms to say that damage is at once irreparable and inappreciable. Where either party may suffer by the granting or withholding an injunction, the rule in equity requires the court to balance the inconveniences likely to be incurred by the respective parties by means of the action of the court, and to grant or withhold the injunction according to a sound discretion. When an injunction might cause irreparable damage to the defendant in the event of the plaintiffs' not being exclusively entitled, but the damage sustained by the plaintiff in the event of establishing his title allows

of compensation, the injunction will be refused. Hilliard on Injunctions 27; *Grey* v. *Ohio*, &c., 1 Grant 412; *Hartridge* v. *Rockwell*, Charl. R. M. 260. At least an injunction will not issue where the benefit to one party is but small, while it will operate oppressively and to the annoyance and injury of the other. *Jones* v. *Newark*, 3 Stockt. 452. The remedy for the plaintiffs, if they have any, is the plain and adequate one of an action at law on the case, if their rights have been infringed.

The fact that the plaintiffs had not established their title at law is decisive against the application for an injunction. It is always necessary that the title should be established at law, unless it is admitted. *Storm* v. *Mann*, 4 Johns. Ch. 21; *Davenport* v. *Davenport*, 7 Hare 217.

The propositions established by the defendants are,—(1) That as to the two or three inches excess of water flowed back by the frame dam built in 1843, above the amount flowed back by the previous log dam, the plaintiffs fail to make out a prescriptive right to flow, and therefore, by raising the water this three inches by means of their flash-boards, they were doing the defendant a wrong; and, in accordance with the equitable maxim, "He that seeks equity must do equity," their bill should be dismissed. (2) The bill should be dismissed, on the ground that no prescriptive right can be gained by a mill-owner to occupy the area of the adjacent lands with water, so as to exclude the riparian proprietors from laying the foundation of a building on the same. (3) That, the plaintiffs running down the water from their Middleton reservoirs, built in 1853 or 1854, and from their new Durham reservoirs, built in the fall of 1864, in such a manner that the defendant's land "is covered and flowed with water more uniformly and to a greater depth than it otherwise would be during the summer months" (the defendant's land lying beyond the natural banks of the stream), in accordance with the maxim before cited, there is a want of equity in their claims. (4) The bill should be dismissed, because the damages are inappreciable, and the injury ending in the acts complained of cannot ripen into a right which would be of any further injury to the plaintiffs. (5) Because the plaintiffs' title has not been settled at law.

FOSTER, J. It appears, from the master's report, that the plaintiffs are, and for more than twenty years prior to 1868 have been, the owners in fee of the mills and dams, and the land on which they stand; and that they have obtained, by purchase or otherwise, the right to maintain forever what is called the lower dam, and to flow and cover with water any and all lands which may or can be flowed by means of the said lower dam at its present height.

The alleged obstruction of the plaintiffs' water rights, to prevent which an injunction is desired, is made by building a foundation wall, extending a distance of about fifty feet along and upon the easterly bank of the Cochecho river,—the said wall extending some thirty feet westerly and into the river. This wall is located upon land about

twenty or twenty-five rods above and northerly from the upper dam, which land is covered and flowed with water by means thereof.

I. The first question is, whether the plaintiffs in fact maintained their upper dam at a greater height than they should, and thereby wrongfully caused the water to flow back upon the defendant's land at the point of alleged obstruction; or whether, the dam being no higher than the plaintiffs have a right to maintain it, they have, in such a condition of things, a right to the uninterrupted flow of the water, as regulated by means of the dam.

The present upper dam stands substantially upon the site of a frame dam built in 1843, in the place of an old log dam existing long prior thereto, and is maintained by the plaintiffs at the height of the dam built in 1843; and although, in fact, the dam built in 1843 actually held back more water, flowed the mill-pond of the upper dam to a greater depth, and consequently backed the water up higher upon the adjacent lands than the old dam, still, it appears from the master's report that the plaintiffs have maintained their present upper dam at its present height during the whole of twenty-five years preceding the filing of this bill.

The plaintiffs have therefore acquired the right, by prescription, to maintain their dam at its present height,—their occupation and use of the water during the whole period of twenty-five years, by means of the present and former dams, having apparently been adverse, exclusive, and uninterrupted.    *Watkins* v. *Peck*, 13 N. H. 360.

The adverse and exclusive use of water in a particular manner, for the term of twenty years, confers a right to the continuance of such use and enjoyment as effectually as if the same were acquired by express grant.    2 Bl. Com. 402; *Bullen* v. *Runnels*, 2 N. H. 257; Angell on Watercourses, sec. 372.

If a party claims and exercises for twenty years the right to raise the water as high as his dam will raise it when there is sufficient water to fill it, he will, by such user, acquire a right to the extent of his claim.    *Winnipiseogee Lake Co.* v. *Young*, 40 N. H. 420; *Burnham* v. *Kempton*, 44 N. H. 78; Washburn on Easements 226.

It does not appear at what time in 1843 the new frame dam was built. It had been completed prior to August 30. When the new stone dam—founded upon the site of the frame dam, for which it was intended as a substitute—was completed, in October, 1862, it was found to be from $1\frac{2}{10}$ to $3\frac{3}{10}$ inches lower than the dam of 1843. At that time the abundance of water in the dam rendered it unnecessary, difficult, and to some extent, if not wholly, impracticable to make such an addition to the dam as would bring it up to the height of the former dam. But this addition was made on the arrival of the dry season, July 4, 1863; and ever since that time, except when the flash-boards have been temporarily broken and pushed off by ice and other means, the dam has been maintained to the height of the frame dam of 1843.

The interruption of the plaintiffs' enjoyment, during the few months

between the fall of 1862 and the summer of 1863, in the circumstances disclosed by the master, can by no means be construed into a voluntary abandonment of their claims, nor an involuntary forfeiture of their prescriptive rights, by operation of law. Angell on Watercourses, sec. 211.

II. It therefore becomes immaterial to consider whether, independent of a right by prescription, the plaintiffs have a good paper title, by purchase or grant, to the easement in question, with regard to which, if it were material, the master's report is not sufficiently explicit.

III. The plaintiffs have acquired by purchase certain lands, and the right to flow certain other lands by means of reservoir dams erected and owned by them in Middleton and New Durham. By means of these dams the plaintiffs are accustomed to retain their surplus water in wet seasons, and to let it down in reasonable quantities in drier seasons, so distributing and using it as to equalize, as nearly as possible, the quantity running to their mills throughout the whole year.

The master finds that the quantity of water so let down from said reservoir is not larger than is accustomed to flow in some seasons of the year, but is considerably larger than the accustomed flow of the stream in such dry season; and the result is, that the channel is more uniformly full of water through the year. The natural channel of the river between said reservoir and said upper dam at Rochester is sufficient to carry all the water which the plaintiffs send down from their reservoir, and the water so sent down has run within the natural banks of the stream until it reached said upper dam mill-pond, and has never, unless a very heavy rain fell while the gate was open, overflowed the natural banks. But in consequence of this detention of the water in the reservoir, and sending it down in a mode different from its natural flow, the channel is kept more uniformly filled with water through the year, so that in the summer months the adjacent meadows of riparian owners are not so thoroughly drained, and the water percolates them during the summer from the stream under the earth; and thereby, in process of time, the grass is rendered of inferior quality and less in quantity. Another consequence of, and the one especially sought by this detention and letting out of the water by means of the reservoir is, that the plaintiffs' said upper dam is kept more uniformly full during the summer months, and they are thus enabled, in times of naturally low water, to secure more power and head for driving their machinery. By the same means the land of the defendant is covered and flowed with water more uniformly and to a greater depth than it otherwise would be during the summer months, since the building of said Middleton reservoir.

It is well settled that in the use of a stream for domestic, agricultural, and manufacturing purposes, to which every riparian owner is entitled, there may of right be diminution, retardation, or acceleration of the natural current, consistently with the common right, and which is implied in the right to use it at all.

If the mill-owner, by letting down water from his reservoir dam for use of his mill in the dry season, renders intermediate land less valuable for cultivation, he is not liable in damages, provided the water so let down is reasonably required for the use of his mill, and does not overflow the natural channel. *Drake* v. *The Hamilton Woolen Co.*, 99 Mass. 574;—see, also, *Brace* v. *Yale*, 99 Mass. 488; *Springfield* v. *Harris*, 4 Allen 494.

We are unable to discover, from the reported facts, that the plaintiffs have made any unlawful or unreasonable use of the streams conducting the water from their reservoir dams to their mills.

But an important and perhaps difficult question is presented by the peculiar position of this case. For, although the plaintiffs have the right to maintain the water at a level with the top of their dam, provided they can do so by the appliances controlled by them prior to the acquisition of those rights which have enabled them to construct and maintain their Middleton and New Durham reservoirs; and although the water sent down the river, by means of those reservoirs, never overflows the natural banks of the river, unless in exceptional times of heavy rains while the gates are open,—still, the water is sent down the stream in a mode different from its natural flow, the channel is kept more uniformly filled with water through the year, and the plaintiffs' upper dam is kept more uniformly full during the summer months.

Now the plaintiffs have not acquired the right by prescription nor by grant to increase the natural flow of the water within the channel of the stream, and they clearly cannot have the right, as against riparian owners, so to enlarge the volume of running water as to fill up the entire width between the river banks, to the detriment of riparian owners. The use of the stream by all parties having rights in it must be reasonable, whether those parties are opposite or contiguous riparian owners, or whether one or more of the parties be a mill-owner, exercising rights and privileges adverse to riparian ownership and rights.

And that may be found to be an essential and important encroachment upon the enlarged volume of water used and enjoyed by these plaintiffs by means of their reservoirs, which would not be an unreasonable encroachment upon, and diversion of, the natural and ordinary current of the stream.

And we are of the opinion that, as against the defendant, the plaintiffs have no right to insist that he shall not be at liberty to make just as much use of the water as he might have made, provided the plaintiffs had not interfered with the natural flow of the river by means of the water sent down from these upper reservoirs.

With reference to the use of a running stream by riparian owners, and others having adverse interests, the law has been recently declared in the house of lords in a manner which we regard as at variance with the general understanding of the true condition of the law, at least in this country.

It is there held that the soil of the *alveus* of a running stream is not the common property of the respective owners on the opposite sides. The share of each belongs to him in severalty, and extends *usque ad medium filum aquæ;* but neither is entitled to use it in such a manner as to interfere with the natural flow of the stream.    A fence or bulwark on the bank is allowable, but the *alveus* is sacred.

In the case referred to—*Bickett* v. *Morris*, L. R. 1 H. L. Sc. 47—the appellant (to use the language of his counsel) was dragged into court, simply for building on his own property, and taking in a small strip of the *alveus*—a strip which at one end was only about two feet six inches wide, and which gradually grew less towards the other end.

The Lord Chancellor (CHELMSFORD) said,—" The important question in the case is, whether the respondents were entitled to a declaration that the appellant had no right or title to erect any building, or otherwise to encroach upon or to interfere with that part of the *solum* of the river which is immediately opposite their property, beyond a certain line ; and to a decree ordering him to take down and remove the building, or other erections, in so far as these extend into or encroach upon the *solum* of the river beyond the said line, and interdicting them from erecting any building or otherwise encroaching upon the *solum* of the river beyond the line in question.

" There is a general statement in the pleas in law of the encroachment complained of being injurious to the respondents' property ; but no proof was given by them of any actual injury, but only of a probability of injury, from the building being advanced farther into the river than the line agreed upon.

" The result of the opinion of the judges of the second division appears to be, that a riparian proprietor has no right to erect any building *in alveo fluminis;* and if he does so, although the opposite proprietor may be unable to prove that any damage has actually happened to him by the erection, yet, if the encroachment is not of a slight and trivial, but of a substantial description, it must always involve some risk of injury.    Lord BENHOLME said,—' Without my consent [*i. e.*, the consent of the proprietor of the other side of the river] you are not to put up your building in the channel of the river, for that, in some degree, must affect the natural flow of the water.    What may be the result, no human being with certainty knows ; but it is my right to prevent your doing it ; and when you do it, you do me an injury, whether I can qualify damage or not.'    And Lord NEAVES said,—' Neither can any of the proprietors occupy the *alveus* with solid erections without the consent of the other, because he thereby affects the course of the whole stream.    The idea of compelling a party to define how it will operate upon him, or what damage or injury it will produce, is out of the question.'

" These views appear to me to be perfectly sound in principle, and to be supported by authority.

" The proprietors upon the opposite banks of a river have a common interest in the stream ; and although each has a property in the *alveus*

from his own side to the *medium filum fluminis*, neither is entitled to use the *alveus* in such a manner as to interfere with the natural flow of the water.

"My noble and learned friend, the late Lord Chancellor, during the argument put this question : ' If a riparian proprietor has a right to build upon the stream, how far can this right be supposed to extend ? Certainly [he added] not *ad medium filum ;* for, if so, the opposite proprietor must have a legal right to build to the same extent from his side.' It seems to me to be clear that neither proprietor can have any right to abridge the width of the stream, or to interfere with its regular course ; but anything done *in alveo,* which produces no sensible effect upon the stream, is allowable.

"It was asked in argument whether a proprietor on the banks of a river might not build a boat-house upon it. Undoubtedly this would be a perfectly fair use of his rights, provided he did not thereby obstruct the river or divert its course ; but if the erection produced this effect, the answer would be that, essential as it might be to his full enjoyment of the use of the river, it could not be permitted ; *a fortiori,* when the act done is the advancing solid buildings into the stream, not in any way for the use of it, but merely for the enlargement of the riparian proprietor's premises, which must be an infringement upon the right and interest of the proprietor upon the opposite bank. * * *

"In this case, mere apprehension of danger will not be sufficient to found a complaint of the acts done by the opposite proprietor, because, being on the party's own ground, they were lawful in themselves, and only became unlawful in their consequences, upon the principle of *sic utere tuo ut alienum non lædas.* But any operation extending into the stream itself is an interference with the common interest of the opposite riparian proprietor, and, therefore, the act being *prima facie* an encroachment, the *onus* seems properly to be cast upon the party doing it, to show that it is not an injurious obstruction."

If we consent to this view of the law, it seems to follow, by analogy, that what would be an interference with the common interest of an opposite riparian proprietor must be regarded as an interference with the interest of these plaintiffs, who, by prescription or grant, have acquired a right to the unobstructed flow of the water for the use of their mills below the point of the defendant's encroachment.

Lord CRANWORTH said,—"It is impossible to calculate or ascertain beforehand what may be the effect of erecting any building in the stream, so as to divert or obstruct its natural course."

"If the proprietor on one side can make an erection far into the stream, what is there to prevent his opposite neighbor from doing the same ? The most that can be said in favor of the appellant's argument is, that the question of the probabilities of damage is a question of degree, and so, if the building occupies only a very small portion of the *alveus,* the chance of damage is so little that it may be dis-

regarded.  But this is an argument to which your lordships cannot
listen.        *     *     *     *     *     *     *     *     *     *     *

"It was said, in argument,—'Then if I put a stake in the river, am
I interfering with the rights of the riparian proprietors?' To this I
should answer, *de minimis non curat prætor*.  But further, it might be
demonstrated, in such a case, not that there was an extreme improba-
bility, but that there was an impossibility of any damage resulting to
any one from the act.  It is, however, unnecessary for us to speculate
on any such infinitesimal obstruction.  No one can say that in this case
the extent to which the appellant has built into the river is so small as
to be, like the case of a stake driven into the soil, inappreciable.  I
find nothing in the cases or text-books, to which we were referred, at
variance with the view I have taken of the law.  And the cases of the
*Town of Aberdeen* v. *Menzies* and *Farquharson* v. *Farquharson*, cited by
the Lord Ch. J. CLERK, are in exact conformity with it.  I therefore
come, without hesitation, to the conclusion that the appellant had no
right, independently of contract or consent, to build, as he has built,
into the bed of the river."

And Lord WESTBURY said,—"This is a case of very considerable
importance, because, as far as I know, it will be the first decision es-
tablishing the important principle that an encroachment upon the *alveus*
of a running stream may be complained of by an adjacent or an *ex
adverso* proprietor, without the necessity of proving either that damage
has been sustained, or that it is likely to be sustained from that cause.
The examination that has been given at the bar to the cases cited upon
that point of law, certainly had led me to the conclusion that it has not
yet been clearly established by decisions.  I have felt much difficulty
upon it, because, undoubtedly, a proposition of that nature is somewhat
at variance with the principles and rules established on the subject by
the civil law.  I am, however, convinced that the proposition, as it has
been laid down in the court below, and as it has received the sanction
of your lordships in your judgments, is one that is founded in good
sense, and ought to be established as matter of law."

He concludes as follows:  "It is wise, therefore, to lay down the
general rule, that even though immediate damage cannot be described,
even though the actual loss cannot be predicated, yet, if an obstruction
be made to the current of the stream, that obstruction is one which
constitutes an injury which the courts will take notice of, as an en-
croachment which adjacent proprietors have a right to have removed.

"In this sense, the maxim has been applied by the law of Scotland,
that *melior est conditio prohibentis*, namely, that where you have an
interest in preserving a certain state of things in common with others,
and one of the persons, who has that interest in common with you,
desires to alter it, *melior est conditio prohibentis;* that is to say, you
have a right to preserve the state of things unimpaired and unpreju-
diced in which you have that existing interest."

We find ourselves unable to assent to these doctrines: but we have

devoted so much space and time to the case, not only because of the exalted character of the tribunal and its officers by whom the doctrines have been announced, but also by reason of the importance of the questions involved.

It is quite manifest that the practical application of such principles and rules would be disastrous to the manufacturing interests of this community and this country—interests of such vast importance to the welfare and prosperity of the people as to require and demand, if not active encouragement, at least protection from unnecessary invasion; for, if the law be established in accordance with the doctrine of *Bickett* v. *Morris*, it inevitably follows, not only that a riparian proprietor on shores above the dam which a mill-owner has acquired a prescriptive right to maintain, controlling thereby the waters of the stream, may not make improvements upon his own land, using thereby the waters of the stream, or any portion of the *alveus*, to such an extent as sensibly to divert the current,—but it must also follow, that no bridge with piers laid upon and within the *alveus*, no wharf, no boat-house, much less the dam of an upper mill-owner, can be placed in, upon, or across the stream, whereon a lower mill-owner has established his dam by prescription, even though the consequences may be woefully disastrous to the interests of the proprietor above, and utterly insignificant to him whose rights are technically invaded.

It is difficult to perceive how such doctrines can be applied with practical advantage or safety to a country like Scotland; but we have no hesitation in repelling the effort to apply them to this land, where mighty rivers flow, whose abundant waters may be diverted, here a little and there a little, and used over and over again, not only without detriment to individual rights, but to the comfort and prosperity of many.

A different rule has certainly been applied in this country—one too universally recognized by this court, as also in our sister States, to be disregarded, the operation of which has not yet been found disadvantageous, namely, that no priority of occupation or use of water by a mill-owner, upon a stream within the limits of his own estate, affects the right of a riparian proprietor above to erect and operate a mill in a suitable and reasonable manner upon his own land, or to cultivate or make improvements thereon, using or diverting the waters of the stream for that purpose, unless he thereby sensibly affects the rights of such mill-owner in the use of the water, and works an injury to his mill.

It is competent for a riparian proprietor to change, obstruct, diminish, or deepen the channel of a stream within his own premises, or the mode of applying it to use, provided he return the water in its accustomed channel on to the land of the next proprietor at its accustomed point, and do nothing that materially affects the enjoyment of the water by the adjacent proprietors, according to their legal rights.

In short, every riparian proprietor may make a reasonable use of the

stream running over his own land.    Washburn, Easements, 251, 265, 280.

" What is a reasonable use," * said Bellows, J., in *Hayes* v. *Waldron*, 44 N. H. 584, " must depend upon a variety of conditions, such as the size and character of the stream, and the uses to which it can be or is applied; and, from the nature of the case, it is incapable of being defined to suit the vast variety of circumstances that exist ; but the rule is flexible, and suited to the growing and changing wants of communities."

Whether the diversion or interference with the stream is rightful in a particular case must depend upon the question whether, under all the circumstances of the case, it is or is not a reasonable use of the stream ; and, in determining that question, the extent of the benefit to the mill-owner, and of inconvenience or injury to others, may, very properly, be considered.

These general propositions are sustained by a great weight of authority ; for which see, among others, the cases cited in the opinion of the court in *Hayes* v. *Waldron;*—see, also, *Seeley* v. *Brush*, 35 Conn. 419.

It seems to be conceded by Mr. Gale, in his work on Easements, that " all the proprietors of the banks on each side have a natural right to the reasonable enjoyment of the same stream."    Gale on Easements (4th ed.) 210.    Whether there is any inconsistency in holding this doctrine, and also that declared in the case of *Bickett* v. *Morris*, is not for us to determine.    It is observable that the Lord Chancellor, in that case, unhesitatingly declares that it is not a reasonable use of a river for a riparian proprietor to erect a permanent building, one corner of which shall project 2½ feet into the channel of the stream.    We should regard this matter as a question of fact, and not a question of law.

These reservoir dams, it will be remembered, were built only some six or seven years ago.    They are not maintained by any prescriptive right, nor by any grant which can conclude the rights of the defendant. But they increase the height and volume of water upon the defendant's land, and so must be regarded as an encroachment and invasion upon his rights, which cannot be justified, unless upon the ground that such use of the stream, by means of these reservoirs, is reasonable, as was held in *Drake* v. *Hamilton Woolen Co.*, before cited.

Manifestly, this doctrine of reasonable use must be allowed to work both ways.

---

* And as to the doctrine of reasonable use, see *Bassett* v. *Salisbury Manufacturing Company*, 43 N. H. 569, and *Swett* v. *Cutts*, 50 N. H. 439. The late Chief Justice Bellows not only concurred fully with the opinion delivered by Mr. Justice Bartlett in *Dr. Bassett's* case (43 N. H. 569), but drew up a most carefully prepared and elaborate opinion sustaining the same view.                                        Reporter.

In view of all the facts and circumstances, so fully reported by the master, we certainly cannot find, either as matter of law or fact, that the diversion of the *alveus* of the river upon the defendant's land is an unreasonable use of the land, or an unreasonable diversion of the stream; but the decision of this question is unnecessary for the purposes of this case.

The plaintiffs, admitting that their damages by reason of the defendant's technical invasion are small, but failing to show that they have sustained any whatever, or even the slightest inconvenience, ask for the extraordinary interposition of the court, by way of injunction, to restrain apprehended encroachments by others, and prevent the possible damage that may result therefrom. ·

It is by no means manifest that proceedings at law are not abundantly sufficient to compensate the plaintiffs for any damages sustained by reason of the acts whereof they complain.    If such remedy is adequate, this court would be very slow to proceed by way of injunction. Neither does it follow that, because the court is vested by statute with almost unlimited discretion in this particular, an injunction will or should be granted, even where a plaintiff has not only established his right and title at law, but has also recovered damages for the very invasion, the continuance of which he seeks by bill in equity to prohibit and restrain.

The principles governing the court in such cases, and, in our judgment, peculiarly applicable to the present, are stated in *Wason* v. *Sanborn*, 45 N. H. 169, and *Bassett* v. *Salisbury Manuf. Co.*, 47 N. H. 426.

In the former case, BELL, C. J., says,—" To authorize the court's interference by injunction, there should appear imminent danger of great and irreparable damage, and not of that for which an action at law would furnish full indemnity."

In the latter case, BELLOWS, J., remarks,—" The power to grant injunctions to prevent injustice has always been regarded as peculiar and extraordinary.    It is not controlled by arbitrary and technical rules, but the application for its exercise is addressed to the conscience and sound discretion of the court.

" Ordinarily it will not be exercised when the right of the complainant is doubtful, and has not been settled at law; and even where it has been so settled, an injunction will not be granted when the remedy at law is adequate.    It is not enough that an injury merely nominal or theoretical is apprehended, even although an action at law might be maintained for it; but to justify the interposition of this summary power, there must be cause to fear substantial and serious damage, for which courts of law could furnish no adequate remedy.    What injuries shall be regarded as irreparable at law must depend upon the circumstances of the particular case.    If the injury be trivial, as by slightly darkening a neighbor's window, or raising the water of a river a few inches upon his rocky shore, doing him no appreciable or serious damage, equity would not, ordinarily, interfere by injunction, even in cases where the right had been established at law; for the power is extraordinary in

its character, and is to be exercised, in general, only in cases of necessity, and when the court can see that other remedies are inadequate to do justice between the parties ; and even then it is to be exercised with great care and discretion."

In support of these views many authorities are cited. The result of all these considerations is, that the bill

*Must be dismissed.*